UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

THOMAS SCHMOLKE                               CIVIL ACTION

VERSUS                                        NO.  10-1534

N. BURL CAIN, WARDEN                          SECTION "I"(4)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

## I.    Factual and State Procedural Background

The petitioner, Thomas Schmolke ("Schmolke"), is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  On August 10, 2004, Schmolke and a co-defendant, Katrina K. Currier, were charged by bill of information in St. Tammany Parish with one

---

[1]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 3.

count of theft over $500 and one count of attempted theft over $500.[3]  Currier eventually entered

a plea of guilty as to count one, and the State entered a nolle prosequi as to her on count two.[4]

The record reflects that, in October of 2003,  Poole Lumber Company ("Poole") hired

Schmolke to work in its warehouse behind the sales area of its facility.[5]  At that time, Poole would

accept returned purchases from customers by taking the materials to be returned to the warehouse

where the customer would obtain a "return goods material slip."  The return goods material slip

indicated the type and quantity of goods returned and could be signed by any of the three workers

in the warehouse, including Schmolke.  The customer would present the signed slip at the sales area

and receive a cash refund of up to $500.00.  Refunds over $500.00 had to be mailed to customers.

Mike Manguno, Poole's General Manager, reviewed all documents concerning cash refunds

given out by Poole.  He became suspicious of the relatively large number of refunds given to Katrina

Currier.  The inventory records did not support the alleged returns of merchandise.  Manguno also

did not recognize the signature of the worker allegedly receiving materials back from Currier.  Also,

on a May 6, 2004 refund slip, Manguno noticed that Currier's last name was different.

Manguno indicated that on April 9, 2004, Currier was refunded $145.20 for materials

allegedly returned to Poole.  The return goods material slip was initialed by "TS," and Schmolke

was working in the warehouse at the time of the alleged return.  On April 17, 2004, Currier was

refunded $325.19 for materials allegedly returned to Poole.  The initials on the return goods material

---

[3]St. Rec. Vol. 1 of 5, Bill of Information, 8/10/04.

[4]*Id.*, handwritten notation, 11/3/04; *State v. Schmolke*, 949 So.2d 675 (La. App. 1st Cir. 2007) (Table); *State v. Schmolke*, No. 2006-1419, 2007 WL 437330, at *6 (La. App. 1st Cir. Feb. 9, 2007); St. Rec. Vol. 3 of 5, 1st Cir. Opinion, 2006-KA-1419, p. 10, 2/9/07.

[5]The facts are taken from the published opinion of the Louisiana First Circuit on direct appeal.  *State v. Schmolke*, 2007 WL 437330, at *1-3; St. Rec. Vol. 3 of 5, 1st Cir. Opinion, 2006-KA-1419, pp. 3-5, 2/9/07.

slip were illegible.  Manguno indicated the handwriting at the top of the receipt looked almost exactly like the other papers signed by Schmolke, and he was working in the warehouse at the time of the alleged return.  The customer telephone number provided by Currier on that return belonged to Cleve Allison.  Manguno telephoned Allison and learned that Allison had not returned any materials.

On April 20, 2004, Currier was refunded $113.54 for materials allegedly returned to Poole.  The return goods material slip was initialed by "TS," and Schmolke was working in the warehouse at that time.  On April 27, 2004, Janet Beasley requested a refund of $651.85 for materials allegedly returned to Poole.  When asked to provide a name and address for mailing of the refund, Beasley provided Poole with a name and address that did not exist.  Schmolke was working in the warehouse at the time of the alleged return.

On May 6, 2004, "Katrina Maguteo" was refunded $164.68 for materials allegedly returned to Poole.  The return goods material slip was signed by "Patt."  A person named "Pat" did work at Poole, but he did not work in the warehouse and did not spell his name with a double "t."  Schmolke was working in the warehouse at the time of the alleged return.

By May 11, 2004, Manguno had alerted the sales clerks to inform him the next time Currier came into the store or to write down the license plate number of her vehicle.  On that date, Currier made a purchase at Poole, and Manguno was provided with the license plate number of her vehicle. Schmolke left for lunch on May 11, 2004, and never returned to Poole.  Thereafter, Manguno checked Schmolke's list of emergency contacts and saw that "Katrina Cariare" was listed on the form.  Manguno alerted the police to the offenses.

St. Tammany Parish Sheriff's Office Detective Roy Chadwick Hartzog investigated the offenses at Poole.  On June 14, 2004, he questioned Schmolke concerning his involvement in the

offenses.  Schmolke was nervous, but denied any participation in the offenses. After Detective

Hartzog showed Schmolke the documents provided by Manguno, he confessed, orally and in

writing, to participating in one of the fraudulent returns at Poole.  After Detective Hartzog pointed

out the similar signatures on the return goods material slips and inconsistencies in his version of his

involvement, Schmolke confessed, orally and in writing, to participating in five fraudulent returns

at Poole.  In his written confession, Schmolke stated:[6]

> I did 5 returns at [P]oole[.] It was my idea to do it[.] I got some of the money and she
> kept the rest[.] [N]o one eles (sic) was involved exept (sic) me and Katrina[.] I'm
> very sorry for doing it and would like to repay the money.

On July 12, 2004, Schmolke also advised Detective Hartzog that his sister, Janet Beasley,

had been involved in the failed attempt to obtain a fraudulent refund from Poole.

In the meantime, on July 9, 2004, Detective Hartzog questioned Currier concerning the

offenses at Poole.  She confessed in writing to participating in the fraudulent returns involving

$145.20 on April 9, 2004, $325.19 on April 17, 2004, $113.54 on April 20, 2004, and $164.68 on

May 6, 2004.  She also indicated the "scam was thought out by Thomas."  Currier also testified at

trial that, on each of these occasions, Schmolke gave her a ticket listing items that were supposedly

returned.  He instructed her to take the ticket to the counter and to tell the person at the counter the

number at the top of the ticket.  She gave the money she obtained from Poole either to Schmolke

or to his girlfriend, Amber.

Schmolke was tried before a jury on January 3 and 4, 2005, and was found guilty as charged

on both counts.[7]  At a hearing held on March 21, 2005, the Trial Court denied Schmolke's motions

---

[6]*State v. Schmolke*, 2007 WL 437330, at *3; St. Rec. Vol. 3 of 5, 1st Cir. Opinion, 2006-KA-1419, p. 5.

[7]St. Rec. Vol. 1 of 5, Trial Minutes, 1/3/05; Trial Minutes, 1/4/05; Trial Transcript, 1/3/05; Trial Transcript,
1/4/05; St. Rec. Vol. 2 of 5, Trial Transcript (continued), 1/4/05.

for new trial and for post-verdict judgment of acquittal.[8]  That same day, the State filed a multiple

offender bill charging Schmolke as a fourth or subsequent felony offender.[9]

After hearings on June 2 and 10, 2005, the Trial Court denied Schmolke's motion to quash

the multiple bill and adjudicated him to be a fourth or subsequent felony offender.[10]  The Court

sentenced him to serve life in prison as a fourth or subsequent offender for the theft conviction and

one year in the parish prison for attempted theft, to be served concurrently with the life sentence.[11]

Schmolke's counsel orally moved for appeal, and the Trial Court instructed counsel to file a written

motion.[12]

Over nine months later, on March 16, 2006, Schmolke's appointed counsel filed motions to

reconsider the sentence, for post-verdict judgment of acquittal, and for a new trial.[13] The Trial Court

denied each of the motions.  Counsel also filed a motion for appeal, which the Trial Court granted.[14]

On March 27, 2006, Schmolke submitted an application for post-conviction relief in which

he alleged that he was denied his right to appeal and his right to appointed counsel on appeal.[15]  The

---

[8]St. Rec. Vol. 1 of 5, Hearing Minutes, 3/21/05; Motion for New Trial, 3/17/05; Motion for Post-Verdict Judgment of Acquittal, 3/17/05; St. Rec. Vol. 2 of 5, Motion Hearing Transcript, 3/21/05.

[9]*Id.*; St. Rec. Vol. 1 of 5, Multiple Bill, 3/21/05.

[10]St. Rec. Vol. 1 of 5, Hearing Minutes, 6/2/05; Multiple Offender Hearing Minutes, 6/10/05; Answer and Motion to Quash Multiple Offender Bill, 6/6/05; St. Rec. Vol. 2 of 5, Motion Hearing Transcript, 6/2/05; Multiple Bill Hearing Transcript, 6/10/05.

[11]St. Rec. Vol. 1 of 5, Multiple Offender Hearing Minutes, 6/10/05; St. Rec. Vol. 2 of 5, Multiple Bill Hearing Transcript, 6/10/05.

[12]*Id.*

[13]St. Rec. Vol. 1 of 5, Motion to Reconsider Sentence, 3/16/06; Motion for Post-Verdict Judgment of Acquittal, 3/16/06; Motion for New Trial, 3/16/06; Trial Court Order (1), 3/26/06; Trial Court Order (2), 3/26/06; Trial Court Order (3), 3/26/06.

[14]St. Rec. Vol. 1 of 5, Motion for Appeal, 3/16/06.

[15]St. Rec. Vol. 1 of 5, Uniform Application for Post-Conviction Relief, 4/5/06 (dated 3/27/06).

Trial Court dismissed the application without prejudice in light of counsel's motion for appeal and amended its prior order to clarify that he was granting Schmolke an out of time appeal.[16]

On appeal, Schmolke's counsel raised two assignments of error:[17] (1) he was denied the right to conflict-free counsel where trial counsel also represented the co-defendant Currier; and (2) the life sentence was excessive. Schmolke was granted leave to file a supplemental memorandum in which he reargued the denial of his right to conflict-free counsel and also argued that the evidence was insufficient to support the conviction.[18] On February 9, 2007, the Louisiana First Circuit affirmed Schmolke's conviction, habitual offender adjudication, and sentences, finding no merit to any of the claims raised.[19]

The Louisiana Supreme Court denied without stated reasons Schmolke's subsequent writ application on October 26, 2007.[20] Schmolke's convictions and sentences became final 90 days later, on January 24, 2008, because he did not file a writ application with the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. S. Ct. Rule 13(1); *see also, Jiminez v. Quarterman*, 555 U.S. 113, __, 129 S. Ct. 681, 686-87 (2009) (where a state court grants a criminal defendant the right to file an

---

[16]St. Rec. Vol. 1 of 5, Trial Court Order, 4/26/06; Per Curiam Order, 4/25/06.

[17]St. Rec. Vol. 5 of 5, Appeal Brief, 06-KA-1419, 8/9/06.

[18]St. Rec. Vol. 5 of 5, Pro Se Supplemental Brief, 06-KA-1419, 9/18/06; 1st Cir. Order, 2006-KA-1419, 8/22/06.

[19]*State v. Schmolke*, 949 So.2d at 675; *State v. Schmolke*, 2007 WL 437330, at *1; St. Rec. Vol. 3 of 5, 1st Cir. Opinion, 2006-KA-1419, 2/9/07.

[20]The State failed to provide a copy of this writ application. *State v. Schmolke*, 966 So.2d 573 (La. 2007); St. Rec. Vol. 3 of 5, La. S. Ct. Order, 2007-KO-0617, 10/26/07.

out-of-time appeal during state collateral review, his judgment is not yet final for purposes of seeking federal habeas review).

On September 24, 2008, Schmolke submitted an application for post-conviction relief to the Trial Court raising five grounds for relief:[21] (1) He received ineffective assistance of counsel where counsel (a) failed to call Currier at the pretrial suppression hearing, (b) failed to investigate third party guilt or call David Tripp, (c) failed to call a defense expert, (d) failed to question Currier in an adversarial manner, (e) failed to use the known facts so as not to hurt Currier's case, (f) failed to properly argue sufficiency of the evidence at trial, (g) failed to properly file for appeal, and (h) failed to raise claims of double jeopardy; (2) counsel was ineffective due to a conflict of interest and failure to put the State's case to meaningful adversarial test; (3) trial and appellate counsel were ineffective for failure to argue sufficiency of the evidence at trial and on appeal; (4)(a) the convictions for both counts violated double jeopardy, and (b) counsel was ineffective for allowing double jeopardy at trial; and (5)(a) the multiple bill was filed without a grand jury indictment, and (b) the multiple offender proceeding was conducted without a jury.

After receiving the district attorney's response, the Trial Court dismissed the application for post-conviction relief finding the claims to be unfounded, without indicating its reasons, in its order issued October 16, 2008.[22] Both the Louisiana First Circuit and the Louisiana Supreme Court denied Schmolke's subsequent writ applications without stated reasons.[23]

---

[21]St. Rec. Vol. 3 of 4, Uniform Application for Post-Conviction Relief, 9/26/08 (dated 9/24/08).

[22]St. Rec. Vol. 3 of 4, Order and Reasons, 10/16/08; District Attorney's Answer, 10/7/08.

[23]*State ex rel. Schmolke v. State*, 25 So.3d 825 (La. 2010); St. Rec. Vol. 4 of 5, La. S. Ct. Order, 2009-KH-0766, 1/29/10; La. S. Ct. Writ Application 09-KH-766, 4/6/09 (postmarked 3/20/09, dated 3/19/09); St. Rec. Vol. 3 of 4, La. S. Ct. Letter, 2009-KH-766, 4/6/09 (showing postmark of 3/20/09); 1st Cir. Order, 2008-KW-2379, 3/6/09. The State failed to provide a copy of the Louisiana First Circuit writ application, although Schmolke provides an unfiled, uncertified copy (Rec. Doc. No. 3-3, p. 12).

## II.    <u>Federal Petition</u>

On June 24, 2010, the clerk of this Court filed Schmolke's federal petition in which he raised six grounds for relief:[24] (1) counsel was ineffective for failing to inform petitioner of a conflict of interest or put the State's case to a meaningful adversarial test; (2) trial and appellate counsel were ineffective for failure to argue sufficiency of the evidence at trial and on appeal; (3)(a) the convictions violated double jeopardy, and (b) counsel was ineffective for allowing the double jeopardy at trial; (4)(a) the multiple bill was filed without a grand jury indictment, and (b) Louisiana law unconstitutionally allows enhancement of a sentence without jury findings; (5) he was denied the right to conflict free counsel; and (6) the life sentence was unconstitutionally excessive.

The State filed an answer and memorandum in opposition to Schmolke's petition conceding that the petition was timely filed and the claims have been exhausted.[25]   The State also argues that Schmolke's claims are without merit.

In his traverse to the State's memorandum in opposition, Schmolke reiterates his arguments in support of his claims.[26]

## III.   <u>General Standards of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[27] applies to this petition, which is deemed filed in this Court under the federal

---

[24]Rec. Doc. No. 3.

[25]Rec. Doc. Nos. 9, 10.

[26]Rec. Doc. No. 11.

[27]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

mailbox rule on May 2, 2010.[28]  The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim.  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c) (2006)).

The State concedes, and the record shows, that Lee's petition is timely and his claims are exhausted.  In addition, none of his claims are in procedural default.  The Court will proceed to review the merits of the claims raised.

## IV.    Standards of a Merits Review

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000).  It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court

---

[28]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  The clerk of court filed Schmolke's federal habeas petition on June 24, 2010, when the filing fee was paid.  Schmolke dated his signature on the petition on April 27, 2010, but he signed the signature on the attached memorandum on May 2, 2010.  The latter date is presumed to be the earliest date on which he could have delivered the set of documents to prison officials for mailing to a federal court. The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his pro se petition.  *See Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing *Spotville*, 149 F.3d at 374).

findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA.  The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485.  A state court's decision can involve an "unreasonable application" of federal law if it either: (1) correctly identifies the governing rule but then applies it unreasonably to the facts; or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable.  *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law.  *cf. Wright v. West*, 505 U.S. 277, 304 (1992).  The court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law.  *See, e.g., id.* at 305; *see also Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir. 2000), *cert. denied*, 531 U.S. 1002 (2000).  "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'"  *Price v. Vincent*, 538 U.S. 634, 641 (2003)

(quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, __ U.S. __, 131 S. Ct. 1388, 1398 (2011).

## V.   Analysis

### A.   Double Jeopardy (Claim No. 3(a))

Schmolke alleges that his conviction for both theft over $500 under La. Rev. Stat. Ann. § 14:67 and attempted theft over $500 under La. Rev. Stat. Ann. §§ 14:67, 14:27 violated the double jeopardy clause. He argues that under *Blockburger v. United States*, 284 U.S. 299 (1932) and Louisiana's same evidence test, he has received multiple punishments for the same conduct. Schmolke raised this claim in his application for post-conviction relief which was denied by the state courts without stated reasons.

A double jeopardy claim raises a mixed question of law and fact for purposes of this Court's federal habeas review. *Carlile v. Cockrell*, 51 Fed. Appx. 483, 2002 WL 31319380, at *1 (5th Cir. 2002) (applying the AEDPA's mixed question standard to a double jeopardy claim); *Johnson v. Karnes*, 198 F.3d 589, 593 (6th Cir. 1999) (same).

The Double Jeopardy Clause of the Fifth Amendment protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977). In this case, Schmolke was not charged with two distinct statutes; he instead was charged with multiple violations of the same statute, with one being only an attempt. His claim therefore arises under the third premise and questions whether the multiple counts of theft over $500 were "the same act or transaction" as defined by *Blockburger* and its progeny.

A challenge to multiplicity raises double jeopardy concerns, which would protect a defendant against multiple punishments for the same offense where the legislature did not authorize cumulative punishment for one offense. *United States v. Ogba*, 526 F.3d 214, 232-33 (5th Cir. 2008) (quotations and citations omitted). "'An indictment is multiplicitous if it charges a single offense in multiple counts, thus raising the potential for multiple punishment for the same offense, implicating the [F]ifth [A]mendment double jeopardy clause.'" *United States v. Reagan*, 596 F.3d 251, 253 (5th Cir. 2010) (quoting *United States v. Brechtel*, 997 F.2d 1108, 1112 (5th Cir. 1993)); *United States v. Soape*, 169 F.3d 257, 266 (5th Cir. 1999) (citing *United States v. Nguyen*, 28 F.3d 477, 482 (5th Cir. 1994)). "The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." *United States v. Cluck*, 143 F.3d 174, 179 (5th Cir. 1998) (quoting *United States v. Swaim*, 757 F.2d 1530, 1537 (5th Cir. 1985)).

Where the question of multiplicity arises, as here, because of multiple transactions, the question becomes "'whether separate and distinct prohibited acts, made punishable by law, have been committed.'" *United States v. Lee*, No. 08-0148, 2009 WL 481264, at *1 (E.D. La. Feb. 20, 2009) (Lemmon, J.) (citing *United States v. Cluck*, 143 F.2d at 179). To determine if the charged

counts constitute separate or discrete acts or transactions, the Court must look to the "allowable unit of prosecution" within the language of the charged statute.[29] *United States v. Planck*, 493 F.3d 501, 503 (5th Cir. 2007); *United States v. Reedy*, 304 F.3d 358, 365 (5th Cir. 2002); *Ivery v. Collins*, 4 F.3d 989, 1993 WL 360743, at *3 (5th Cir. Aug. 24, 1993) (Table, Text in Westlaw).

The Supreme Court has noted that the Double Jeopardy Clause imposes few, if any, limitations on the legislature's power to define criminal offenses. *Sanabria v. United States*, 437 U.S. 54, 69 (1978); *United States v. Bolin*, 997 F.2d 881, 1993 WL 261088, at *1 (5th Cir. Jul. 6, 1993) (Table, Text in Westlaw) ("'[T]he double jeopardy clause imposes no restraints on the power of Congress to define the allowable unit of prosecution and punishment where all the charges are brought in one suit.'") (quoting *United States v. McDonald*, 692 F.2d 376, 377 (5th Cir. 1982)). Once the legislature has defined the statutory offense with an "allowable unit of prosecution," that determines the scope of protection afforded by the principles of double jeopardy. *Sanabria*, 437 U.S. at 69-70; *Bolin*, 1993 WL 261088, at *1 (The "'sole question' is 'whether Congress intended to provide for multiple punishments.'"). Thus, whether a particular course of conduct constitutes more than one offense under the same statute depends on legislative choice. *Id*. With regard to state criminal offenses, the federal courts are bound by state court determinations of state law. *See Swarthout v. Cooke*, __ U.S. __, 131 S. Ct. 859, 861 (2011); *Missouri v. Hunter*, 459 U.S. 359, 367-368 (1983).

In this case, Schmolke was charged in count one with an aggregate offense of theft over $500 encompassing the successful takings with Currier between April 9 and May 6, 2004, in violation of

---

[29]In recognizing this test, the United State Fifth Circuit has recognized that "'the double jeopardy clause imposes no restraints on the power of Congress to define the allowable unit of prosecution and punishment where all the charges are brought in one suit.'" *United States v. Bolin*, 997 F.2d 881, 1993 WL 261088, at *1 (5th Cir. Jul. 6, 1993) (Table, Text in Westlaw) (quoting *United States v. McDonald*, 692 F.2d 376, 377 (5th Cir.1982)). The "'sole question' is 'whether Congress intended to provide for multiple punishments.'" *Id*., at *1.

La. Rev. Stat. Ann. § 14:67.  In the second count, he was charged with the attempted theft of over $500 for the failed attempt to take the money with Janet Beasley as his accomplice in violation of La. Rev. Stat. Ann. § 14:67 and La. Rev. Stat. Ann. § 14:27, which defines attempt.  Applying the foregoing law, Schmolke's convictions for these distinct counts did not violate the Double Jeopardy Clause.

Based on the premises of *Blockburger*, the Louisiana Supreme Court has specifically held that the legislative purposes of La. Rev. Stat. Ann. § 14:67, under which Schmolke was convicted, allow the district attorney to either aggregate or separately charge a person with individual acts of taking or misappropriation.  *State v. Joles*, 492 So.2d 490, 494 (La. 1986).  "There is neither any language to indicate nor any logical reasons to infer that the legislative purpose was to *prevent* the district attorney from charging a thief with separate counts for separate acts of major thefts, even when the misappropriations occurred in a single and continuous scheme involving a single victim within a relatively short period of time." (emphasis in original) *Id.*, at 494.  The Court concluded that § 14:67 "applies to *permit* a number of petty thefts to be aggregated into a major theft, it was never intended to *require* that a number of major thefts must be charged as only one offense."  *Id.*, at 495. The Court also noted that the statute was without restriction to "a continuous scheme or a single victim or a time frame" in affording the district attorney the discretion to individually or aggregately charge the offenses.  *Id.*, at 494.  The Court even recognized the district attorney's authority to aggregate some of the acts into one count to achieve a greater felony.  *Id.*, at 494-495.

Thus, under Louisiana law, each distinct theft by Schmolke was a separate completed transaction which could have been charged as a separate count.  *Id.*, at 494 & n.8.  The State was allowed to, and did, aggregate some of the offenses to achieve a higher felony base and also charged

the particular theft, or attempted theft, as a separate count.  The charges were not multiplicitous or in violation of the protections against double jeopardy under state or federal law.

For the foregoing reasons, Schmolke has not established that the separate counts charged by the State for the aggregated thefts over $500 in count one and the separate charge in count two for attempted theft over $500 on a different day in a different act were multiplicitous or violative of the double jeopardy clause.[30]  The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court law.  Schmolke is not entitled to relief on this claim.

### B.     Multiple Offender Proceedings (Claim No. 4(a), (b))

Schmolke alleges that the filing of a multiple bill, where he faced a life sentence, without a grand jury indictment violated due process.  He also argues that the adjudication as a multiple offender should have been a decision for a jury to protect his due process rights.  Schmolke raised these claims in his application for post-conviction relief which was denied by the state courts without stated reasons.

With regard to Schmolke's claim that his multiple bill should have been issued by a grand jury, his claim is without basis in law.  First, he has not identified any Supreme Court precedent or other federal authority to support his claim.  Further, this Court's research has located no such legal requirement.  Instead, the law indicates that Schmolke has no protected right to a grand jury in connection with his multiple offender adjudication for the following reasons.

Under Louisiana law, the "prosecution" of an offense punishable by death or life imprisonment "shall be instituted by indictment by a grand jury."  La. Code Crim. P. art. 382.

---

[30]This conclusion is similar to the first of three holdings in *Blockburger* itself, where the United States Supreme Court resolved that a court could punish each of a number of drug sales made to the same man at different times, since they were separate completed transactions, and this would not violate double jeopardy.  *Blockburger*, 284 U.S. at 301-302.

However, a multiple offender or enhancement proceeding is not the prosecution of an offense and does not charge the defendant with a new crime. *State v. Vincent*, 56 So.3d 408, 414-15 (La. App. 4th Cir. 2011). "The enhancement of the penalty for habitual offenders convicted of a new felony only addresses itself to the sentencing powers of the trial judge after conviction and has no functional relationship to the innocence or guilt of the instant crime." *State v. Walker*, 416 So.2d 534, 536 (La. 1982).

Because such proceedings are not determinative of guilt or innocence under Louisiana law, they do not offer the accused the full range of due process and other constitutional rights normally attendant to such guilt adjudications. *Buckley v. Butler*, 825 F.2d 895, 902-03 (5th Cir. 1987); *State v. Dorthey*, 623 So.2d 1276 (La. 1993) (Because the multiple offender hearing is not a trial, legal principles such as res judicata, double jeopardy, the right to a jury trial do not apply). As a result, the United States Supreme Court has recognized that "'[t]he Due Process Clause does not, . . . require a State to adopt one procedure over another on the basis that it may produce results more favorable to the accused." *Parke v. Raley*, 506 U.S. 20, 32 (1992) (quoting *Medina v. California*, 505 U.S. 437, 451 (1992)).

Louisiana law does not provide for a grand jury indictment under its procedures for a multiple offender adjudications. *State v. Vincent*, 56 So.3d 414-15. For these reasons, there is nothing here to give rise to a constitutional violation reviewable by this federal habeas court. *See Scott v. Cain*, No. 07-6430, 2008 WL 2185381, at *10 (E.D. La. Apr. 21, 2008) (Wilkinson, M.J.) (report and recommendation), adopted by, No. 07-6430, 2008 WL 2223282, at *1 (E.D. La. May 21, 2008) (Engelhardt, J.), *affirmed*, 364 Fed. Appx. 850 (5th Cir.), *cert. denied*, 130 S. Ct. 3519 (2010).

Schmolke also argues that he was entitled to a jury trial on his multiple offender adjudication. This too is without legal basis. The United States Supreme Court has held that the Constitution does not require that proof of the fact of a prior conviction be brought to a jury. *Apprendi v. New Jersey*, 530 U.S. 466, 590 (2000). In *Apprendi*, the Supreme Court stated that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490 (emphasis added). The Supreme Court reiterated this rule in its subsequent rulings in *Blakely v. Washington*, 542 U.S. 296 (2004) and *United States v. Booker*, 543 U.S. 220 (2005), recognizing exceptions to the *Apprendi* rule for prior convictions and habitual offender adjudications. *Accord Williams v. Terrell*, 2006 WL 1751059 (W.D. La. May 2, 2006) (discussing holdings and non-retroactivity of the cases).

Even prior to *Apprendi*, the United States Fifth Circuit Court of Appeals held that the Sixth Amendment does not require a trial by jury for multiple offender proceedings. *Buckley*, 825 F.2d at 904 n.3. Instead, bestowing such a right to a defendant is left to state law, and in Louisiana there is no such provision. *Id.* (citing La. Rev. Stat. Ann. §15:529.1(D)); *see* La. Rev. Stat. Ann. §15:529.1(D)(2) ("Following a contradictory hearing, the <u>court</u> shall find " that the defendant is a second, third, or fourth offender) (emphasis added); La. Rev. Stat. Ann. §15:529.1(D)(3) ("When the <u>judge</u> finds " that defendant has been convicted of a prior felony) (emphasis added). Louisiana law does not provide for a jury trial in connection with Schmolke's multiple offender adjudication. *State v. Vincent*, 56 So.3d at 415. He therefore has failed to present a violation of his due process rights.

Schmolke has failed to establish a constitutional error or violation of federal law arising from his multiple offender adjudication without a grand jury indictment and without a jury's consideration

17

of his enhancement.  The state courts' denial of relief was not contrary to, or an unreasonable application of, Supreme Court precedent.  Schmolke is not entitled to relief on this claim.

### C.   <u>Excessive Sentence (Claim No. 6)</u>

Schmolke argues that his life sentence as a fourth or subsequent felony offender is excessive, in light of the fact that his current conviction is not a violent crime.  Schmolke's counsel raised this claim on direct appeal.

The Louisiana First Circuit found that Schmolke's life sentence was the maximum and was still within the statutory limits.  The Court also resolved that the Trial Court did not abuse its discretion in choosing the maximum sentence where the Court found there were no mitigating factors present, there was a likelihood that Schmolke would commit another crime, he was in need of correctional treatment in a custodial environment, and a lesser sentence would minimize the seriousness of his crime.  This was the last reasoned opinion on the issue.

Federal courts accord broad discretion to a state trial court's sentencing decision that falls within statutory limits.  *Haynes v. Butler*, 825 F. 2d 921, 923-24 (5th Cir. 1987); *Turner v. Cain*, 199 F.3d 437 (5th Cir. 1999) (unpublished) (sentence was within Louisiana statutory limits and within trial court's discretion, therefore petitioner failed to state cognizable habeas claim for excessive sentence).  As here, if a sentence is within the statutory limits, a federal habeas court will not upset the terms of the sentence unless it is grossly disproportionate to the gravity of the offense.  *Harmelin v. Michigan*, 501 U.S. 957 (1991); *Solem v. Helm*, 463 U.S. 277 (1983).

"[W]hen a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality,'" a court then considers (a) the sentences imposed on other criminals in the same jurisdiction; and (b) the sentences imposed for commission of the same offense in other jurisdictions.  *Smallwood v. Johnson*, 73 F.3d 1343, 1346-47 (5th Cir. 1996);

*McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992).   When a habeas petitioner has been

sentenced under a habitual offender statute, a federal court must consider "the seriousness of his

most recent offense, not as it stands alone, but in the light of his prior offenses."  *McGruder*, 954

F.2d at 316.

        At the time of his crime and conviction, La. Rev. Stat. Ann. § 15:529.1(A)(1)(c)(I) allowed

for a life term to be imposed on a fourth or higher felony offender like Schmolke:

> A. (1) Any person who, after having been convicted within this state of a felony or
> adjudicated a delinquent under Title VIII of the Louisiana Children's Code for the
> commission of a felony-grade violation of either the Louisiana Controlled Dangerous
> Substances Law involving the manufacture, distribution, or possession with intent
> to distribute a controlled dangerous substance or a crime of violence as listed in
> Paragraph (2) of this Subsection, or who, after having been convicted under the laws
> of any other state or of the United States, or any foreign government of a crime
> which, if committed in this state would be a felony, thereafter commits any
> subsequent felony within this state, upon conviction of said felony, shall be punished
> as follows:  . . .
> (c) If the fourth or subsequent felony is such that, upon a first conviction the offender
> would be punishable by imprisonment of any term less that his natural life then:
> (I) The person shall be sentenced to imprisonment for the fourth or subsequent
> felony for a determinate term <u>not less than the longest prescribed for a first
> conviction but in no case less than twenty years and not more than his natural life</u> .
> . .

(emphasis added).

        Schmolke does not challenge the fact that he had six prior felony convictions, including one

for indecent behavior with a juvenile and the remainder for simple burglary.[31]   As such, under

---

[31]As noted by the Louisiana First Circuit, his prior convictions were as follows: "Predicate # 1 was set forth
as the defendant's June 15, 1994 guilty plea, under Twenty-second Judicial District Court Docket # 226568, to simple
burglary. Predicate # 2 was set forth as the defendant's October 17, 1996 guilty plea, under Twenty-second Judicial
District Court Docket # 239250, to indecent behavior with a juvenile. Predicate # 3 was set forth as the defendant's
October 17, 1996 guilty plea, under Twenty-Second Judicial District Court Docket # 244317, to simple burglary.
Predicate # 4 was set forth as the defendant's October 17, 1996 guilty plea, under Twenty-Second Judicial District Court
Docket # 260645, to simple burglary. Predicate # 5 was set forth as the defendant's October 17, 1996 guilty plea, under
Twenty-Second Judicial District Court Docket # 260647, to simple burglary. Predicate # 6 was set forth as the
defendant's March 3, 1997 guilty plea, under Twenty-Second Judicial District Court Docket # 260648, to simple
burglary."  *State v. Schmolke*, 2007 WL 437330, at *1 n.1.

Louisiana law, Schmolke's fourth or subsequent felony was subject to the imposition of the life sentence at the trial court's discretion, which in this case was based in part on the seriousness of his prior crimes and his propensity for criminal behavior.

The United States Supreme Court has stated that "'[t]he Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime.'" *Ewing v. California*, 528 U.S. 11, 23 (2003) (quoting *Harmelin*, 501 U.S. at 1001 (Kennedy J., concurring in part and concurring in judgment)). The Supreme Court has recognized that only the rare case will reach the level of gross disproportionality. *Id.*, 538 U.S. at 30 (quoting *Harmelin*, 501 U.S. at 1005). As noted above, disproportionality is judged by whether similar sentences have been imposed for the same offense. *Smallwood*, 73 F.3d at 1346-47.

At the time of Schmolke's crime and conviction, his theft over $500 conviction carried a sentence, with or without hard labor, for not more than five years, or a fine of not more than $2,000, or both. As noted above, the enhancement under Louisiana's habitual offender laws increased his sentencing exposure to not less than 20 years nor more than natural life.

Louisiana courts consistently impose the maximum life sentence to fourth or subsequent offenders similarly situated. *See*, *e.g.*, *State v. Jones*, 761 So.2d 596 (La. App. 5th Cir. 2010) (life for fourth offense for possession of a stolen car, with prior convictions for theft, possession of a weapon, and manslaughter); *State v. Mitchell*, 969 So.2d 800 (La. App. 2d Cir. 2007) (life for fourth or subsequent offense for obscenity with intent prior convictions for simple burglary, aggravated burglary, aggravate rape of a minor, and unauthorized entry into a place of business); *State v. Windham*, 748 So.2d 1220 (La. App. 5th Cir. 1999) (life fourth or subsequent offense for attempted simple burglary with priors including theft, simple burglary, and armed robbery).

20

Nothing Schmolke has argued distinguishes his situation as an exception to the cases cited above in which a life sentence was imposed. His persistent criminal history does not support his suggestion that he is unlikely to commit another crime. As noted by the state courts, his record has been just the opposite. The imposition of a life sentence upon Schmolke as a fourth or subsequent offender was not so extreme that it violated the Eighth or Fourteenth Amendments.

For the reasons discussed above, the state courts' finding that Schmolke's sentence was not excessive was not contrary to established Supreme Court case law, nor was it an unreasonable application of that precedent. This claim is without merit.

### D.   Ineffective Assistance of Counsel (Claim Nos. 1, 2, 3(b), and 5)

Schmolke argues that he received ineffective assistance of counsel on several grounds: failure to inform him of a conflict of interest or put the State's case to a meaningful adversarial test because of the conflict; failure to argue sufficiency of the evidence at trial and on appeal; failure to challenge double jeopardy at trial; and failure to challenge Louisiana law where it unconstitutionally allows enhancement of a sentence without jury findings.

Schmolke's counsel first raised the issue of counsel's conflict of interest, representing both Schmolke and Currier, on direct appeal. The Louisiana First Circuit denied relief finding that Schmolke had not established an actual prejudice resulting from the dual representation. The Court noted that Currier entered a plea of guilty prior to Schmolke's trial, without any agreement that she testify against Schmolke, thereby ending the evidentiary conflict suggested by Schmolke. The Court also noted the other strong evidence of guilt in Schmolke's own written and oral confessions.

The remaining grounds in support of his ineffective assistance, and his re-hash of the conflict of interest claim were raised in his application for post-conviction relief. The state courts' denied relief on those claims without specified reasons.

21

The issue of ineffective assistance of counsel is a mixed question of law and fact. *Richards v. Quarterman*, 566 F.3d 553, 561 (5th Cir. 2009). Thus, the question before this court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, United States Supreme Court precedent.

As cited by the state appellate court, the standard for judging the performance of counsel was established by the United States Supreme Court in *Strickland*, 466 U.S. at 668. In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom. *See Strickland*, 466 U.S. at 697. To meet the burden of proving ineffective assistance of counsel, the petitioner "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992); *see also Clark v. Johnson*, 227 F.3d 273, 284 (5th Cir. 2000), *cert. denied*, 531 U.S. 1167 (2001). In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88; *Little v. Johnson*, 162 F.3d 855, 860 (5th Cir. 1998). The analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all of the circumstances. *See Strickland*, 466 U.S. at 689. "[I]t is necessary to 'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart*

22

*v. Fretwell*, 506 U.S. 364, 371 (1993) (quoting *Strickland*, 466 U.S. at 690).   Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.   *See Crockett v. McCotter*, 796 F.2d 787, 791 (5th Cir. 1986); *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *United States v. Kimler*, 167 F.3d at 893.   Furthermore, "[t]o meet the prejudice prong, the [petitioner] must affirmatively prove, and not merely allege, prejudice." *DeVille v. Whitley*, 21 F.3d 654, 659 (5th Cir. 1994); *Theriot v. Whitley*, 18 F.3d 311, 314-15 (5th Cir. 1994).   In this context, a reasonable probability of prejudice is "a probability sufficient to undermine confidence in the outcome."   *Id*.

In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett*, 796 F.2d at 793.   A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.'   But it is not enough, under Strickland, 'that the errors had some conceivable effect on the outcome of the proceeding.'" *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting *Strickland*, 466 U.S. at 693).   Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)), *cert. denied*, 531 U.S. 849 (2000).   Thus, scrutiny of counsel's performance "must be highly deferential" and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional

23

assistance." *Moore v. Johnson*, 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland*, 466 U.S. at 689-90); *Mattheson*, 751 F.2d at 1441.

On habeas review, the United States Supreme Court has clarified that, under *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington v. Richter*, __ U.S. __, 131 S.Ct. 770, 788 (2011). The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

(citations and quotation marks omitted) *Harrington*, 131 S. Ct. at 788.

### a.   <u>Conflict of Interest</u>

Schmolke alleges that his counsel violated his Sixth Amendment right to conflict-free counsel when he failed to disclose to him that he was conflicted by his simultaneous representation of Currier. He also argues that he was prejudiced by the conflict where counsel did not adequately or vigorously challenge Currier's testimony at trial, so as not to harm her case.

"'Under the Sixth Amendment, if a defendant has a constitutional right to counsel, he also has a corresponding right to representation that is free from any conflict of interest.'" *Morin v. Thaler*, 374 Fed. Appx. 545, 551 (5th Cir. 2010) (quoting *United States v. Vaquero*, 997 F.2d 78, 79 (5th Cir. 1993)). Although the traditional *Strickland* standard of review is outlined above, conflicts of interest arising from multiple representations is considered under the standards set forth

in *Cuyler v. Sullivan*, 446 U.S. 335 (1980).  *Beets v. Scott*, 65 F.3d 1258, 1265-66 (5th Cir. 1995) (en banc).

In *Cuyler*, the Supreme Court considered whether "the mere possibility of a conflict of interest warrants the conclusion that the defendant was deprived of his right to counsel." *Id*., at 345. In addressing this question, the Court reiterated its prior holding that there are circumstances under which an attorney can represent multiple criminal defendants in connection with the same criminal transaction without offending the Sixth Amendment.  *Id*.  The Court held that, where there is no objection at or before trial, counsel's representation will only give rise to a cognizable ineffective assistance claim if the representation "actually affected the adequacy of his representation."  *Id*., at 349-50.  If the petitioner establishes the existence of an actual conflict that hampered counsel's representation of him, then he need not prove further prejudice under the second prong of *Strickland*. *Morin*, 374 Fed. Appx. at 551 (citing *Mickens v. Taylor*, 535 U.S. 162, 166 (2002).

The showing of the conflict must be "tightly bound to the particular facts," and not merely hypothetical, speculative, or potential in nature. (citations omitted) *Id*., at 551-52.  An "actual conflict" exists under *Cuyler* when defense counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending the divergent or competing interests of a former or current client.  *See Strickland*, 466 U.S. at 692.  "Adverse effect" on the representation may be established with evidence that "some plausible alternative defense strategy or tactic" could have been pursued, but was not because of the actual conflict impairing counsel's performance.  *See Perillo v. Johnson*, 205 F.3d 775, 782 (5th Cir. 2000).

In addressing Schmolke's claims, the Louisiana First Circuit applied the proper standard as set forth in Schmolke.  In doing so, the Court found that any conflict arising from counsel's

representation of Currier had ended prior to Schmolke's trial.  The Court also did not find any prejudice to Schmolke's case in light of the evidence of his guilt proven at trial.

Schmolke argues here that his counsel did not or was unable to adequately cross-examine Currier at trial about the facts of the case.  "It is well established that the defendant is denied effective assistance of counsel in those instances where an attorney is unable to cross-examine, or is chilled in the cross-examination of, a government witness because of the attorney/client privilege arising from counsel's prior representation of the witness or from his duty to advance the interests of the witness as a current client." *United States v. Soudan*, 812 F.2d 920, 927 (5th Cir. 1986).  However, "[t]he petitioner must specifically identify instances in the record that reflect that his counsel made a choice between possible alternative courses of action such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir. 1983); *United States v. Fox*, 613 F.2d 99, 102 (5th Cir.1980).  Thus, to demonstrate an actual conflict arising from prior representation where the prior client is now serving as the State's witness against counsel's current client, the habeas petitioner must demonstrate that some confidences passed between the attorney and his former client. *Losada v. Johnson*, 95 F.3d 1149, 1996 WL 481358, at *6 (5th Cir. Aug. 14, 1996) (Table, Text in Westlaw).

Schmolke has not demonstrated the existence of any such conflicts on the record.  He suggests that counsel's brief cross-examination indicates a choice to protect Currier without challenging her testimony.  A review of her testimony during questioning by the State reflects that she testified regarding the details of the thefts she and Schmolke perpetrated.[32]  She identified

---

[32]St. Rec. Vol. 2 of 5, Trial Transcript, pp. 153-167, 1/4/05.

Schmolke in court.[33]  She also testified that her plea and sentence were not premised on her testimony at Schmolke's trial.[34]

Schmolke has not pointed to any facet of Currier's testimony that counsel should have challenged in greater detail.  Her testimony confirmed that which Schmolke had already confessed to in his statements, which he claimed were induced.  He has not offered any alternative line of questioning that would have benefitted the defense.  His suggestion that counsel was protecting Currier is no more than mere speculation.

Furthermore, as the record demonstrates, when Currier testified, she had already entered a plea of guilty and was apparently serving her 15-month sentence for the thefts charged in count one of the bill of information.[35]  Her guilt was already confessed on the record.  Schmolke has not shown how counsel was obliged in any way to protect her innocence from the charges for which she was already convicted or any confidence she may have shared regarding her guilt or innocence.  Schmolke has not met his burden to show any basis for counsel to have been torn in his duties to him as required by *Cuyler* or that counsel had a conflict or a conflict that in any way affected his presentation of Schmolke's defense.

The state courts' denial of relief on this issue was not contrary to, or an unreasonable application of *Cuyler*.  Schmolke is not entitled to relief on this claim.

###### b.      Failure to Argue Sufficiency of the Evidence at Trial and on Appeal

Schmolke suggests that his trial counsel could have more vigorously challenged the sufficiency of the evidence presented by the State at trial.  He now argues that he was actually

---

[33]*Id.*, p. 158.

[34]*Id.*, pp. 168-69.

[35]Rec. Doc. No. 3, p. 17 (quoting St. Rec. Vol. 2 of 5, Trial Transcript (continued), pp. 167-168, 1/4/05.

innocent of the crimes and his inculpatory statements were coerced by his belief that charges would not be filed against him.  He appears to argue that, since he was really innocent and he did not mean to confess, his counsel should have been able to better challenge the evidence.

The record reflects that, prior to trial, the state trial court denied the defense's motion to suppress Schmolke's statements, which he testified that he made voluntarily but in anticipation of the charges being dropped if he paid restitution.[36]  Faced with the State's ability to use the statements at trial, counsel's strategy was to convince the jury that Schmolke was not the only perpetrator in light of the differences in the documents presented by the State at trial.[37]  Counsel also cross-examined the State's police witnesses in great detail about the receipts and the investigation done to determine if anyone else was involved other than Schmolke.  He challenged the testimony of the Poole Lumbar manager about the return procedures, including his efforts to investigate the questioned return receipts.  Schmolke has not established that counsel's trial tactics were deficient or other than reasonable performance in light of the facts of the case.

Schmolke has not established that this decision was contrary to, or an unreasonable application of *Strickland*.  Counsel engaged in reasonable strategic decisions based on the case that was to be presented to the jury.  The fact that his defense strategy was unsuccessful does not mean that he acted deficiently or that he failed to adequately challenge the State's case.  *Strickland*, 466 U.S. at 689.

Furthermore, Schmolke also faults his appellate counsel for failing to raise the sufficiency of the evidence on direct appeal.  The Supreme Court has long-recognized that appellate counsel

---

[36]*See e.g.*, St. Rec. Vol. 1 of 5, Trial Transcript, p. 28, 1/4/05.

[37]*See e.g.*, *Id.*, pp. 66-67 (Defense Opening Statement), 1/4/05; St. Rec. Vol. 2 of 5, Trial Transcript (continued), p. 68 (Defense Opening Statement), 1/4/05.

filing a merits brief need not and should not raise every nonfrivolous claim; instead counsel may select from among them in order to maximize the likelihood of success on appeal. *Jones v. Barnes*, 463 U.S. 745 (1983).

In this case, Schmolke's insufficient evidence claim was not a "non-frivolous" claim. He raised the claim himself on appeal, and the Louisiana courts denied the claim as meritless. Failure to raise a meritless claim on appeal would not be deficient performance. *See Anderson v. Quarterman*, 204 Fed. Appx. 402, 410 (5th Cir. 2006) ("The issues that Anderson argues his counsel should have raised on direct appeal . . . lack merit. As such, failure to raise these issues did not prejudice Anderson."); *see also*, *Kossie v. Thaler*, No. 09-20581, 2011 WL 1659395, at *3 (5th Cir. Apr. 28, 2011) (recognizing the Supreme Court's premise that only when ignored claims are stronger than those raised will the presumption of effectiveness be overcome) (citing *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). Schmolke is not entitled to relief on this claim.

### c. Failure to Challenge Double Jeopardy at Trial and Challenge Sentence Enhancement Without a Jury

In his final two facets of the ineffective assistance of counsel claim, Schmolke argues that his counsel was deficient in failing to challenge his exposure to double jeopardy at trial. He also alleges that counsel was deficient in failing to argue that Louisiana's enhancement provisions denied him his right to a trial by jury on the multiple bill.

For the reasons detailed above, the Court has already resolved that Schmolke's conviction and sentence for theft over $500 and for attempted theft over $500 in this case did not violate the Double Jeopardy Clause. In addition, the Court has already resolved that Schmolke did not have a right to a jury trial under either state or federal law on his multiple bill. Counsel was not deficient for failing to raise legally meritless or frivolous arguments or objections. *Parr v. Quarterman*, 472

29

F.3d 245, 256 (5th Cir. 2006) (citing *United States v. Kimler*, 167 F.3d at 893 ("An attorney's failure to raise a meritless argument thus cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.")); *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for . . . failure to raise a legally meritless claim.").

For these reasons, Schmolke has not shown that the state courts' denial of relief on these claims was contrary to, or an unreasonable application of, *Strickland*.  Schmolke is not entitled to relief.

## VI.    Recommendation

It is therefore **RECOMMENDED** that Thomas Schmolke's petition for issuance of a writ of habeas corpus be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[38]

New Orleans, Louisiana, this 24th day of May, 2011.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[38]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.